Good morning. May it please the court. Michael Bourne for the Appellant's Appeal. This is a Title VII case on appeal from the District Court's grant of summary judgment in the Western District of Wisconsin. Dr. Xiong raised claims of employment discriminant and retaliation in violation of Title VII on appeal. Xiong is requesting that the court reverse the district court's order and remand the case for further proceedings. Xiong was hired as the Director of Affirmative Action at the University of Wisconsin Oshkosh campus. And he was hired in order to be an aggressive agent to change how things were going on campus, to advocate for further diversity in the staff, and to closely monitor all of the university's hiring practices. Seems like he got the aggressive part right. That may be true, yes. So if he had looked at this and he believed there was discrimination happening, it was his job to say something about it and push for changes. So when he saw problems, that's what he did. When he got to his job, he learned about complaints from current and former employees. He saw that there were white employees being promoted that bypassed the normal EEO procedures. And finally, this all came to a head when he tried to hire a Latina candidate for a position in his department, that he had the authority to make that decision, only to have his supervisor, the head of the HR department, intervene, ask to re-interview a white candidate, and tell him that minorities are not a good fit for HR. So after his concerns at this point, he'd come to the conclusion that if his job is subject to being overruled by somebody who doesn't want to hire minorities, his job is just nothing more than lip service. So he went to the vice chancellor of his division, who he was supposed to be discussing and advising about these issues, and told him, look, I think the university is discriminating against minorities in hiring and promotions. This is what happened with this candidate I'm trying to hire, and really, I can't work with this supervisor anymore. And instead of taking some action on that, Zhang was fired a few days later. Did he threaten to resign? The way I understood the facts, a little bit different, which is significant here. I understood the facts as him demanding to be assigned a different supervisor, or if he wasn't, he would resign. Our position is that, well, as I understand the facts, he never said, or I will resign. The distinction is, he put in an email, I can't work with Shauna anymore. That was the name of his boss. He did not say, or what he was going to do, in terms of what he said to the person he sent the email to, the decision maker. Privately, Zhang thought, okay, if I can't get a new supervisor, maybe in a few months, I think I'm going to resign in a few months. But the important thing here is, why did the university fire him? What matters is what the decision maker thought. Yeah, but did he tell anybody at the university at any point that he would resign if he was not reassigned to a different supervisor? No. And in fact, it does not appear that Fletcher, to whom he was speaking, understood it that way. Right, exactly. Because Fletcher's response was, well, we certainly hope this will work out and we'll come to a resolution. And so it was all about continued future dialogue, not a feeling, at least on the employer's part, that they were being threatened with a resignation. Yes, exactly. I mean, that's a version of the facts that only came out at summary judgment. But at the time, the decision maker, James Fletcher, said to him, I think we can work this out. And he was thinking, maybe if we talk and we all talk together and have better communication, the two of them will be able to work better together. The most striking thing about this case to me is really something that the university has just never had anything to say about. At summary judgment, the university and their witnesses just may have drawn out to be a terrible employee, just disrespected his supervisor, butting heads with everybody, just this guy who couldn't work well with others. And I guess saying he's done with his supervisor is the most audacious thing someone could say. It was kind of their version of events, and that's the main reason the university says he was fired. But the university has never had anything to say about the fact that the reason he was butting heads with everyone and complaining about his supervisor was that he was making complaints about discrimination. And that's not a reason to fire someone. Those are protected complaints. And I would like to draw the court's attention to just one case that I believe is really just positive of John's retaliation claim, which is Castro versus DeVry University. In that recent decision, the court, the employee was, this court's recent decision, the employee was terminated and the employer came and said he had volatile, insubordinate behavior, he wasn't cooperative. But then the explanation of this kind of uncooperative behavior from the employer included, was not limited to, but included protected complaints he had made. An email saying, oh, he's the person that complained about this supervisor, he keeps going over his supervisor's head, he challenges everything as being racially motivated. And that's very similar to what happened here. When John complained about racial discrimination to the chancellor's chief of staff, she went, she understood, she testified that she understood it was a complaint of discrimination. But yet she went to the decision maker and said, yeah, I do think you should fire him. He came in and he was being unprofessional and complaining about his supervisor and I thought that was insubordinate and inappropriate. When he told his supervisor he believed she was treating the Latina job applicant differently, she said, I don't appreciate you making this about race. And then went and wrote a negative performance review in which she also said that when he had complained of a pay disparity, that was a job performance concern. And then this performance review was something the decision maker said that he relied on. Mr. Warren, can I ask you about the scope of the retaliation claim as it comes to us? Yes. Okay. So, I think it's pretty clear to me that at summary judgment, your client argued that the people of color don't fit in the HR department. That comment that was advanced by Mr. Jean to Mr. Fletcher in the March 6th meeting is a core basis of the retaliation claim. But you also argue in your brief that there's other dimensions to it. That Mr. Jean was more broadly complaining about or advancing concerns that underrepresented employees were being treated unfairly in the workplace, including with respect to pay and what have you. That's the part of your argument that I'm not, it did not seem clear to me that you appropriately preserved below. Sure. I have, I guess, a two-part answer to that. I don't, as I recall the argument that was made in the district court about retaliation specifically, I don't think it had much to do with that comment made by Jean's supervisor. It was focused on timing and the fact that it was, the point was explicitly made that the fact that they commented on his protected complaints was evidence of retaliation. So, specifically the, you know, the pay part being in his performance review, the chief of staff saying that it was unprofessional for him to come and complain. I'm wondering if I'm missing part of your question. No, I, so here's what, I thought the core of his argument on retaliation was on March the 6th, I told James Fletcher that Sean Acquaither made this completely inappropriate comment about people of color not being welcomed in the HR group. They're not a fit in the HR group. On March 7th, the very next day, Mr. Fletcher made a decision to terminate the plaintiff and then sought to give appropriate notice and approvals within the university. Okay, I thought that was the core of the retaliation argument, that this is not a situation where there's been a number of intervening events that create some confusion or some questions about causation in the timeline, that the time fit here is very tight. Yes. He puts this in the meeting on March 6th, and then on March 7th, Fletcher made a decision to fire him, therefore allowing a jury to find that there is retaliation in the termination. And I would agree with that in that the timing is absolutely a large part of this. The matters I've been discussing now definitely expanded the discussion on appeal, which I believe we have every, you know, right to do as appellants. But yeah, I do not mean to de-emphasize the… Well, you weren't his counsel at the time either, right? Right. So you've reviewed the record. That could explain it too. But the way that I saw it presented to the district court was primarily around the comment about people of color not fitting in HR and the timing of that comment to Mr. Fletcher. The timing of Zhang reporting, making these complaints. Yeah, I'm glad that you've been asked to clarify because I understood it quite differently, that his complaints were much broader than that. His complaints began as early as March 1, not March 6, but March 1 about the treatment of the Latina candidate and his superior's decision to bypass his hiring process and insist on interviewing a white candidate when he had determined that the Latina candidate was the one to hire who was more qualified in his estimation. And so those, the complaints of that process, not just that one comment. And then also the idea that he mentioned to McClellan, you know, we've got a bigger problem here because you have this other employee, Sean Crawford, who made these exit interview comments. So can you clarify the retaliation as presented to this district court? Then again, we can affirm on any basis. We have a de novo review here. But how broad was the retaliation picture painted? I agree with what you are saying, both in terms of what was presented to the district court and how I see it on appeal and how I have attempted to present it on appeal. There was basically a few days at the beginning of the early March where Zhang went from just kind of sharing some general concerns to making all kinds of complaints like you referenced. And they got very direct and explicit about the fact that they were racial discrimination. The timing, it just kind of built over several days. So the timing is still very close in time. It's not that there was some intervening, you know, cause in between the first of the month and the seventh of the month. But that is the picture as you're explaining it is how I see it. Mr. Bourne, was it during that March 6th meeting when he delivered, I have to look back at the record regarding whether it was an ultimatum or not, but was it during the March 6th meeting when he said, I won't work with her any longer? That was when he said, I won't work with her any longer. I mean, that's kind of an ultimatum, right? I mean, you do what I want or I'm not going to work here anymore. And the university kind of said, well, you're not going to work here anymore. Well, I mean, I think the issue is one, he didn't say or I'm not going to work anymore. But there is an issue of insubordination here, right? You would agree with that. I think what it comes down to here is that the jury had a right to decide that. That shows that this is such a fine-grained issue where he's both making complaints that are protected complaints, very forcefully making these complaints, and also requesting a new supervisor in a pretty forceful way also, which is not protected. And it's all happening at once. And it really just should have gone to the jury to be able to sort that out. Okay, Mr. Bourne, you want to save some time for rebuttal? Yes. Okay, very well. Mr. Kilpatrick, good morning. Good morning, Your Honors. May it please the Court. My name is Stephen Kilpatrick, Assistant Attorney General with the State of Wisconsin, representing Appellee Board of Regents of the University of Wisconsin System. I'm here to argue that the district court got it right, and this court should affirm University of Wisconsin Oshkosh did not fire Dr. Brian Zhang because he is Asian or of Hmong national origin, and it did not fire him as Director of Affirmative Action in retaliation for complaining about race discrimination. There are some key points that I'd like to make today. Dr. Zhang certainly was a difficult employee. He was insubordinate to his direct supervisor, Shawna Kether, and that was shown through the Leadership Council situation. The Leadership Council situation is not a thing that was overlooked. Mr. Fletcher made that one point of purpose. That was a reason for firing of Dr. Zhang. I'm really confused by that, I'll have to admit, because the record shows that she was forwarded all of those emails when he was submitting those draft policy reviews as early as two weeks before the meetings.  We don't have anything in the record establishing that he was supposed to follow some other course, and so it seems to me, I'm not quite sure where Ms. Comfort is coming from, or the university is coming from, saying that she was not kept apprised. It is confusing, Your Honor, and it took me a while to figure it out as well, is that she was aware that he was working on policies. There was a veterans policy and some accessibility policies. What she was not made aware of is that he was going to put it on the agenda of the Leadership Council. She was forwarded all those emails where that was happening, where he submitted them, and then where he got the reply, it's going to be on the agenda. She received each of those emails. What she received was his emails about the policies, but I do not believe she ever received emails that said, I am putting these on the agenda of the Leadership Council. That is what was the concern of UW Oshkosh, is that he, Dr. Zhang, went and put that on the agenda for the Leadership Council without consulting her. She was aware he was making these policy changes, but to put it on the Leadership Council agenda was something that she said that he did not do. So it sounds like there's a dispute there, and that it's material because that was a key, one of the key reasons the university gave, one of three key reasons the university gave for his termination. I do not agree, Your Honor, and the reason is that on this appeal, Dr. Zhang is attempting to dispute proposed findings of fact that the university made and proposed to the district court, and he did not dispute them in response. Document 49 is the final replies of the University of Wisconsin-Oshkosh. What happened? Proposed findings of facts were made. In response, Dr. Zhang is required to dispute them with evidence. So either when I'm saying there is no dispute, and when the district court made a mention of dispute by Dr. Zhang on pages two and three of the district court decision, the district court recognized that Dr. Zhang either said no dispute to many of these proposed findings, or simply put in his dispute a statement without evidence supporting that. And that's why I am saying that many of these purported disputes are not disputes. They're not genuine disputes made by Dr. Zhang. And so I urge the court to look at those documents. In the brief, you would notice that I mentioned the facts, citing the facts from the district court and to our proposed findings and the paragraphs that would show that there was not a dispute made at that time. I agree, Your Honor, that this is de novo review, but it's not a second chance. But, you know, we did look at it, and there are times the district court seems to be wrong. Adjacent to the example you just provided, for example, the district court says that Zhang didn't provide support for his contrary view that he committed Comforter doing a presentation without her knowledge. And the district court very explicitly says he doesn't provide any evidence, affidavit or otherwise. And then you go back and you look at Zhang's proposed for findings of fact, and in his response to the proposed findings of fact, don't cite an affidavit, but his brief in opposition to the motion, explicitly disputes it, and then cites to his proposed findings of fact, which cite to his affidavit. So how can the district court say there was no affidavit? Well, that may be an instance where the district court didn't look at his own, Dr. Zhang's proposed findings, but it does not take away from the other aspects of the reasons for his termination of employment. Again, Dr. Zhang was insubordinate, leadership council incident, disrespectful, telling McQuillan that she had a lack of knowledge about affirmative action. She was insecure, a lack of leadership. This was about his supervisor, Kether. Went behind her back to try to attend meetings with the chancellor and trying to get on his cabinet. McQuillan thought that he tried to reverse the change in reporting structure that was made by the university prior to his hire. And that goes to his ultimatum. The district court decided to call it an ultimatum. We disagree on what to call it. I will call it an ultimatum. Opposing counsel will not. But this is what he said in an email, Dr. Zhang to Fletcher. I'm done reporting to Shawna. That was in the email. Later on, he says, I either report to you or to the chancellor. The other option is report to another vice chancellor. That sounds like an ultimatum to me. And that's what he put in his email to Dr. Fletcher prior to being terminated. Also, your honors, he wrote a poor investigatory report. There was little analysis and parroting witness statements. Those are from not only what McQuillan thought, but Fletcher as well. He misrepresented Kether's involvement in the training and compliance officer hiring. He had said that she was preventing the hiring of a Latina candidate. That's not the case. It is undisputed that she was sick, Ms. Kether, during the interviews. She saw that there was a recommendation by Dr. Zhang to hire the Latina candidate. She simply wanted to review those two candidates, the final two candidates, and never put a stop to it and never prevented him from hiring her. Can we go back to the poor performance report that you just mentioned? The poor, sorry, the investigation report. Should we consider the fact that he was never given any direct feedback on that report, his first report in the job, and then terminated without a performance plan as evidence of pretext? Or should we be looking at those two facts, the lack of direct feedback on that report and the lack of performance plan, as something else? It certainly isn't pretext. What it is is that Dr. Zhang authored that investigative report. It was criticized by McQuillan and Fletcher. Rather than approaching him directly, what they did was contacted University of Wisconsin Legal Counsel and had a training on how to write investigative reports made, and that was made for Dr. Zhang's benefit and other persons' benefit as well. And that was three months later or so. It was in March. It was in March. Yeah, I think you're right. I think it was in March. And so when they then terminate him, they terminate him based on the poor report that happened before the training. Well, yes, there was training after the report, but prior to that, he was given templates and prior investigative reports. But that seems to be a dispute, too. So you dispute that that's a dispute because Dr. Zhang says he was not given any of that. So how do we not find that that's a material dispute? I don't believe he denies that he was offered templates and prior examples of investigative reports. He's denying that he received, quote-unquote, a training. And that is true. He did not receive a training prior to writing the investigative report. He was given training afterwards, but prior to that, he was shown this is how we want these reports to be written. And he did a bad job with that. One of the reasons on appeal is that Dr. Zhang says that now there's this stand-alone national origin discrimination claim that wasn't raised below that he's focusing on complaints about poor grammar in that report. Yes, it's true that there were comments made by McQuillan and Kether that there was poor grammar in those reports. But there was also a lot of complaints about the poor analysis that was done and the parroting of witness statements in the report. So it wasn't an investigative report that was heavy on analysis. And that was the big complaint by Nurasi Ashokan. Go ahead. Do we have any evidence in the record that after the training he prepared another investigatory report that was deemed unsatisfactory to the university? No, he only did one report during his five-month tenure there at the university, Your Honor. Is there anything in his employment documents that require the university to provide him training if he's unable to satisfactorily complete the report? In other words, when he took the employment, is there any handbook or anything along those lines that exists that says, if you do a bad job on a report before we fire you, we'll provide you training, we'll send you to classes. Is there anything like that in the record? No, there's nothing like that in the record. Dr. Zhang did not have any expectation that there would be a training. Kether did, again his supervisor, was surprised that he was terminated prior to receiving any performance improvement plan, but he was not entitled to any performance improvement plan. Mr. Kilpatrick, can I ask you about the retaliation claim? Sure, yes. Why is the timing here of the March 6th with what went down in that meeting and the March 7th decision by Mr. Fletcher that I'm going to go seek the requisite approvals or give the notices to terminate Mr. Zhang, why isn't that enough to create a jury question? Because I totally understand your position that the ultimatum is in subordination, but there just seems, the plaintiff has put forward evidence that in the March 6th meeting he conveyed Kether's statement about people of color not being welcomed in the HR group. I mean, isn't that just, the jury should just sort this out. I disagree, Your Honor, and I believe that the district court attempted to explain that, is because timing isn't everything. Of course there is going to be a retaliation claim made out if an action is taken after a report of discrimination, but that is not enough, and I agree with the district court here. Do you agree that Mr. Zhang's statement conveying Ms. Kether's comment or alleged comment, I know she contested, she said it, but that's protected, correct? That would likely be protected activity. I know the district court... Right, so right on the heels of that statement that he makes to Mr. Fletcher, Fletcher, perhaps because of another reason too, that you call insubordination, you know, takes action to terminate him. And the reason I want to press you on this is because as you know as well as we do, that you don't have to have a singular cause. Here, in other words, a mixed motive kind of termination here, or mixed motive retaliation means plenty to get to a jury. And then maybe the jury will find that Mr. Zhang is not in any way credible on this. Maybe to the contrary, they'll find he's quite believable. It's the whole point of a trial. Well, Your Honor, for the retaliation claim, right, the law requires a but-for causation here. And the way that Dr. Zhang is trying to argue this, first it was, may I continue with my thought, is that it was confusing as to the retaliation claim on how it was presented before the district court as to how it is now. We said last year in lessive that on but-for causation, what but-for causation means is only that the adverse action would not have happened without the activity. Right. You know that. So that just means that there can be more than one cause. Right. And what I was trying to get at, I think what the district court said, is that without more, that may be enough. But here, there is more. Here, the employer can come back with non-retaliatory, legitimate reasons for the adverse action. And those are the same ones that were raised in response to discrimination. It doesn't erase or eliminate Mr. Zhang's point that he says, hey, look, I had a meeting on March 6th. I told this guy something he probably didn't want to hear. Of Keither's comments. And you know what? On March 7th, he canned me. Right. I mean, the timing is awfully close. I mean, the only way it could get closer is if, you know, the step to seek approval to terminate occurred actually on March 6th. I mean, then the law would get ridiculous. Right. But in addition to the reasons, the non-discriminatory reasons are also non-retaliatory reasons. But in that same conversation, the meeting, and the email, there was the ultimatum. The ultimatum, if you don't restructure, I'm going to quit. So isn't that precisely the question for the jury to sort out? No, because...  Because here, the burden shifts to the employer. The employer can show that there are non-retaliatory, legitimate reasons for the adverse action. And that's what we're saying here, is that the same reasons for non-discriminatory reasons are also non-retaliatory reasons. And I apologize for going over. No, no, we're asking you questions. You don't have to apologize. Thank you very much. Thank you, Your Honors. Mr. Bourne, you had a little time left. Thank you. I'd just like to quickly address a couple of things that came up, were both the Leadership Council situation and the supposedly poor investigatory report. The Leadership Council situation is not confusing. It is clear that he sent her the emails that he was submitting it. She got the agenda with his policy proposals on it. The thing I would like to mention is that these things are really evidence of the university's... Really, the employers and the university's witnesses' lack of credibility about the reasons they gave for the termination. With the Leadership Council situation, the record clearly establishes that the supervisor was well-informed about the submissions. Mr. Bourne, let me ask you a question about that follow-up to Judge Gutter's question. In order to show pretext, do you have to show that the university's reasons for firing your client were false? In other words, in this meeting, your client says, let's up the ante. The client says, I'm being discriminated against. By the way, if you don't pay me $5 million and allow me to report directly to the president of the university in Madison, I'm going to quit. The chancellor says, you know what? You're fired for insubordination. Should that go to a jury? Because the timing there, it's right during the meeting. He says, you're discriminating against me. If you don't pay me $5 million and allow me to report right to the president of the university, I'm going to quit. The chancellor says, you're fired.  well, it happened during the same meeting. Should that go to a jury? The question I would ask, which is what is relevant here, is did that decision maker believe that he was really requesting a million dollars? Well, if he said it, why would he not believe it? People don't always take seriously what somebody says to them. Do you have any evidence in the record that the individuals responsible for firing your client didn't believe that they fired him because of the ultimatum? Yes, the evidence is in the chancellor's testimony that when Zhang went to him and said he needed a new supervisor, he says, well, I don't really know what he meant. All I could do is tell him that I sincerely hope that we could work things out. And then he reflects more in the deposition. He says, I thought at the time that if we all talked about it, the two of them could learn to work better together. You hear about the honest belief rule a lot and it comes up in favor of employers. It's good for the goose. It's good for the gander. He privately was planning to leave in a couple months if he couldn't get the new supervisor. But the employer doesn't make a decision, can't say that they fired him based on something that they didn't know about and didn't even think was true. That just really clearly shows the lack of credibility here. I see I'm over my time. Thank you. Okay, very well. The court will take the case under advisement. Thanks to both counsel. We're going to take a five-minute recess and come back with our three remaining arguments.